UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

AVERY V. WILKINS, )
)
    Plaintiff, ) CASE NO.:
v. )
)
WELLS FARGO ADVISORS, LLC, )
a Missouri Limited Liability Company )
)
    Defendant. )
_____)

## COMPLAINT

**COMES NOW**, Plaintiff, Avery V. Wilkins, by and through the undersigned attorney and brings this action pursuant to diversity jurisdiction pursuant to 28 U.S.C. §1332 and hereby alleges:

### JURISDICTION AND VENUE

1. Plaintiff Avery V. Wilkins (hereinafter, "Mr. Wilkins" or "Plaintiff") is a citizen of the State of Florida, who resides in Pasco County.

2. Defendant Well Fargo Advisors, LLC (hereinafter, "Wells Fargo" or "Defendant"), is a Limited Liability Company (LLC) formed and located in the State of Missouri.

3. Pursuant to 28 U.S.C. Section 1332(a), the matter in controversy in this case exceeds $75,000, exclusive of interest and costs, invoking the jurisdiction of this Court.

4. Pursuant to 28 U.S.C. 1332(a)(1), Mr. Wilkins and Wells Fargo Advisors are citizens of different states (Florida and Missouri), further invoking the jurisdiction of this Court.

5. The acts or omissions complained of herein occurred in Pasco County, Florida, making the United States District Court, Middle District of Florida, Tampa Division, the appropriate venue to file this action.

### FACTS

6. Plaintiff, Avery V. Wilkins, is a resident of the State of Florida.

7. On or about January 6, 2012, Mr. Wilkins joined Respondent, Wells Fargo Advisors, LLC, as a Financial Advisor/Associate and Vice-President/Investment Officer.

8. Upon joining Wells Fargo, Mr. Wilkins was sixty-five (65) years old.

9. Mr. Wilkins is presently seventy-four (74) years old.

### I. The Promissory Note

10. On or about January 6, 2012, Mr. Wilkins and Wells Fargo entered a Promissory Note Agreement (hereinafter "the Note"), the written part thereof, attached as **Exhibit A**, which is attached hereto and incorporated herein.

11. The Note purported to be for $460,493.00 and contained an amortization period of ten (10) years.

12. Just prior to executing the Note, a meeting was held at Wells Fargo's office in New Port Richey, Florida.

13. The meeting was attended by then-Regional Manager, Tom Stulshatz ("Mr. Stulshatz"), then- Branch Manager, Christopher Facka ("Mr. Facka"), Mr. Wilkins' partner, Michael Cox ("Mr. Cox"), and Vincent Graziano ("Mr. Graziano").

14. Mr. Graziano was also accepting a position at Wells Fargo and was present for all conversations between Mr. Stulshatz and Mr. Wilkins.

15. The purpose of the meeting was for Mr. Stulshatz to convince Mr. Wilkins, Mr. Cox and Mr. Graziano to move their book of business and become financial advisors for Wells Fargo.

16. Mr. Wilkins and Mr. Cox shared a book of business.

17. Both Mr. Stulshatz and Mr. Facka had financial incentives to employ additional financial advisors under them.

18. During said meeting, Mr. Wilkins raised concerns that the payment period on the proposed Note was for a period of ten (10) years and that if forced to remain at Wells Fargo, he would be 75 years at retirement.

19. Then-Regional Manager, Tom Stulshatz, promised Mr. Wilkins that he could retire after six (6) years, turn over his remaining accounts to his investor partner Michael Cox (or whoever was his investor advisor partner) at the time, and leave Wells Fargo without any further obligation or penalty.

20. It is common practice in the financial advisor industry if a financial advisor retired his book of accounts would pass to another financial advisor and that financial advisor would take on the remaining balance of the retiring financial advisor's note.

21. Mr. Graziano and Mr. Cox were present when Mr. Stulshatz made representations that Mr. Wilkins could retire after six (6) years without any further obligation or penalty to Mr. Wilkins.

22. The above representations were instrumental and material to Mr. Wilkins and his partners' decision to join Wells Fargo.

23. Pursuant to Mr. Wilkins' Employment Agreement (hereinafter the "Employment Agreement"), attached as **Exhibit B,** which is attached hereto and incorporated herein, Mr. Wilkins was entitled to Performance Bonuses at the end of each year of his employment in the amount of $92,099.00 for each eligible year.

24. These bonuses were offered as pay-over-time with the option to receive the full amount immediately, in the form of a loan, with the contracted payment automatically drafted from Mr. Wilkins' commission over a 120-month period.

25. Mr. Wilkins was eligible for a Performance Bonus for the February 2012 to March 2013 period, totaling $92,099.00.

26. Mr. Wilkins was eligible for an additional Performance Bonus for the April 2013 to March 2014 period, totaling $92,099.00.

27. Mr. Wilkins was also eligible for a Best Practice Award pursuant to the Employment Agreement, which entitled Mr. Wilkins to an additional $92,099.00 if his total gross revenue for April 2013 to March 2014 exceeded $331,555.00 and at least 90% of his Key Households completed an Envision Plan of Record and implemented a Service Level Commitment. *See* Employment Agreement ¶ 3(d).

28. Mr. Wilkins opted to receive immediate payment of the above-referenced Performance Bonuses and Best Practice Award and entered into additional Promissory Note Agreements on or about April 1, 2013, April 1, 2014, and August 19, 2014 for a purported $92,099 and an amortization period of ten (10) years for each Promissory Note (collectively, the "Performance Bonus Notes"), attached as **Exhibit C**, which is attached hereto and incorporated herein.

29. Starting in 2016, Mr. Wilkins inquired as to the status of his retirement, and was told by Paul Costello, the Wells Fargo Regional Manager at the time ("Mr. Costello"), that the above agreement would not be honored.

30. Instead of being allowed to retire without further obligation, Mr. Wilkins was told by Mr. Costello that he would be required to pay approximately $479,000, ostensibly representing the outstanding balance on the Note and accompanying Performance Bonus Notes, upon retiring.

31. Mr. Wilkins never received a firm amount as the number consistently changed; therefore, $479,000 was an estimate.

32. Said requirement was in total contravention of Wells Fargo's promise that Mr. Wilkins could leave the company after six (6) years without further obligation or penalty.

33. Wells Fargo made it clear it does not intend to honor the agreement; Mr. Wilkins has been working at Wells Fargo for nine (9) years and has not received the benefit of the agreement.

## II. Improper Withdrawals of Mr. Wilkins' Amortization Schedule

34. Starting in September of 2012, Wells Fargo started withdrawing an amount under the amount noted on the amortization schedule.

35. Wells Fargo created an unknown and unauthorized debt account for Mr. Wilkins.

36. Wells Fargo refused to explain or discuss said debt account.

37. This created a negative amortization loan without Mr. Wilkins' consent or knowledge.

38. Said action will wrongfully increase the note amortization to a period of greater than ten (10) years.

39. Mr. Wilkins did not discover the unauthorized debt account and negative amortization loan until about a year and a half after Wells Fargo began making unauthorized withdrawals in 2016.

40. Mr. Wilkins questioned Wells Fargo regarding the change in withdrawn amounts and the negative amortization loan; he was not provided an explanation.

41. Due to the change in withdraw amounts, Mr. Wilkins' account, along with other Wells Fargo employees' accounts, became in arrears.

42. Mr. Wilkins was not aware of the arrears until he was told that he was approximately twenty-six thousand dollars in debt.

43. Due to this arrearage, Mr. Wilkins was told to sign an amended partnership agreement with his investment advisor partner, Mr. Cox.

44. Additionally, in 2016-2017 the federal minimum wage law changed, and Wells Fargo changed the financial advisor's debt structure.

45. As a result, Wells Fargo financial advisors' notes were extended without the financial advisors' consent or knowledge.

46. Upon information and belief, this increased Mr. Wilkins' loan balance by at least sixteen thousand dollars which increases daily due to interest.

### III. Improper Splitting of Mr. Wilkins' Book of Business

47. In late 2017, an intern named Nicholas A. Manns was brought into the investment partnership with then-Assistant Branch Manager, Michael Cox without Mr. Wilkins' consent, but with the consent of Wells Fargo.

48. On or about December of 2017, Mr. Cox, who was fifty-three (53) at the time, approached Mr. Wilkins with a document that would allow Mr. Manns and Mr. Cox to manage the 401k investment groups without Mr. Wilkins.

49. Even though Mr. Wilkins was unwilling to sign the document to allow the 401k investment groups to be transferred to Mr. Cox and Mr. Manns, Mr. Wilkins was still taken off the 401k investment groups by Wells Fargo to be managed by the much younger Mr. Cox and Mr. Manns.

50. Mr. Cox does not have the authority to take Mr. Wilkins off the 401k investment groups; a Wells Fargo manager would have authorized that without Mr. Wilkins' consent.

51. Through 2018, Mr. Wilkins believes he lost approximately $27,000.00 per year in revenue because Wells Fargo took Mr. Wilkins off the 401k investment groups, which lost revenue continues to accrue to this day.

52. On or about January of 2019, Wells Fargo Branch Manager-in-training, Eric Holder ("Mr. Holder") was to assist Mr. Cox and Mr. Wilkins with splitting their book of business evenly.

53. Mr. Holder told Mr. Cox and Mr. Wilkins that he had never assisted in splitting financial advisors' books so Gene Crookshanks ("Mr. Crookshanks") would assist. Mr. Crookshanks was a regional manager who was trained on matching financial advisors with clients.

54. However, during the meeting to split the Mr. Wilkins' and Mr. Cox's book of business, Mr. Crookshanks did not attend.

55. Instead, Mr. Cox was permitted to show Mr. Wilkins that all the investment accounts were already divided in the way Mr. Cox desired.

56. Again, the change in financial advisors cannot be done by a financial advisor. Someone at Wells Fargo management had to change the assignments for each account.

57. Mr. Wilkins did not have a choice nor was he able to negotiate.

58. Mr. Wilkins reluctantly accepted the terms of the split in Mr. Wilkins' and Mr. Cox's investment accounts.

59. The accounts that were provided to Mr. Wilkins were inappropriately split unevenly and the uneven split significantly lowered Mr. Wilkins' monthly revenue.

## COUNT I - FRAUD IN THE INDUCEMENT

60. Plaintiff re-alleges and incorporates Paragraphs 1 through 59 as if fully set forth herein.

61. On or about January 6, 2012, Mr. Wilkins and Wells Fargo Advisors executed in Pasco County, Florida, a promissory note for a purported $460,493.00, *supra*.

62. On or about December 29, 2011, Wilkins and Wells Fargo Advisors entered an employment agreement (hereinafter "the Employment

Agreement"). See **Exhibit B**, which is attached hereto and incorporated herein.

63. During discussions leading up to the execution of the Note and its purported ten (10) year term of amortization, Mr. Wilkins was adamant in indicating to Wells Fargo that he would be seventy-five (75) years old at the time of the end of the Note, and that due to age and health concerns he could not be expected to work under the Note for the entire 10-year period.

64. Tom Stulshatz, branch manager, purporting to represent company policy at that time, said that Mr. Wilkins could work six (6) years, notwithstanding the 10-year term, and retire at that time with no penalty by just turning over his book of business to his business partner.

65. Mr. Stulshatz and Well Fargo knew at the time that the company had no such provision allowing Mr. Wilkins to work for 6 years and had no intention of honoring this representation.

66. In the late summer of 2016, in anticipation of his expected retirement in 2017, Mr. Wilkins inquired of Wells Fargo as to his impending retirement, only to be met with denials indicating that Mr. Wilkins would be responsible for some $479,000.00 to be relieved of responsibility under the Note for retiring after six (6) years.

67. Mr. Wilkins was forced to stay with Wells Fargo against his will because of such a penalty, *supra*.

68. Mr. Wilkins inquired through Wells Fargo company channels as to when he would be able to leave without such penalty and could never get an answer.

69. Mr. Wilkins was erroneously told by representatives of Wells Fargo that he was in arrears under the Note while he regularly made his payments.

70. As a direct and proximate result of these representations, Mr. Wilkins entered the Promissory Note Agreements, which he otherwise would not have entered had he known of the falsity of these representations.

71. As a direct and proximate result of this inducement, Mr. Wilkins was and continues to be damaged.

**WHEREFORE**, Plaintiff Avery Wilkins is entitled to money damages (including punitive damages), attorneys' fees, interest, and costs against Wells Fargo and such other relief this Court deems just and proper.

## COUNT II – BREACH OF CONTRACT

72. Plaintiff repeats and realleges Paragraphs 1 through 59 of the Complaint as if set forth fully herein.

73. In executing the promissory note and employment agreements, *supra*, the parties established contractual relationships through mutual obligations and consideration.

74. As to the promissory note, the parties agreed that Mr. Wilkins could leave Wells Fargo after six (6) years of employment without penalty or additional obligation.

75. Mr. Wilkins executed the Note in reliance of Wells Fargo's representations that he could leave after six (6) years without penalty or additional obligation.

76. Mr. Wilkins performed or tendered performance according to the Employment Agreements with Wells Fargo, dutifully carrying out his duties for 6 years or more.

77. Upon being notified by Mr. Wilkins of his intention to leave after 6 years, Wells Fargo informed him he could not do so without paying some $470,000.00, ostensibly reflecting a purported obligation to remain at the company ten (10) years or more.

78. In doing so, Wells Fargo breached the contract wherein it promised that Mr. Wilkins could leave the company after 6 years.

79. Mr. Wilkins suffered damages as he was forced to labor without the benefit of what he bargained for.

80. Mr. Wilkins was fraudulently induced, *supra*, to enter said contract.

**WHEREFORE**, Plaintiff Avery Wilkins is entitled to all contract damages, including expectation and reliance damages, interest, his

reasonable attorneys' fees, and costs against Wells Fargo and such other relief this Court deems just and proper.

## COUNT III – BREACH OF CONTRACT – DEBT ACCOUNT

81. Plaintiff repeats and realleges Paragraphs 1 through 59 of the Complaint as if set forth fully herein.

82. In executing the promissory note and employment agreements, *supra*, the parties established contractual relationships through mutual obligations and consideration.

83. Under the Note, the parties agreed to a repayment plan of 112 equal monthly installments of principal and interest in the amount of $4,649.65 through authorized payroll deductions.

84. However, starting in 2016, Wells Fargo began drawing amounts under the amounts noted in the amortization schedule.

85. Wells Fargo's deductions from Mr. Wilkins' payroll are in breach of the Note's repayment plan.

86. Wells Fargo created an unknown and unauthorized debt account for Mr. Wilkins and other affected advisors.

87. Wells Fargo refused to explain or discuss said debt account.

88. This created a negative amortization loan without Mr. Wilkins' consent or knowledge.

89. Said action will wrongfully increase the note amortization to a period of greater than ten (10) years.

90. Mr. Wilkins questioned Wells Fargo regarding the change in withdrawn amounts and the negative amortization loan; he was not provided an explanation.

91. Due to the change in withdraw amounts, Mr. Wilkins suffered damages as he became in arrears.

92. Mr. Wilkins was not aware of the arrears until he was told that he was approximately twenty-six thousand dollars in debt.

**WHEREFORE**, Plaintiff Avery Wilkins is entitled to all contract damages, including expectation and reliance damages, interest, his reasonable attorneys' fees, and costs against Wells Fargo and such other relief this Court deems just and proper.

### COUNT IV – BREACH OF CONTRACT – FEDERAL MINIMUM WAGE

93. Plaintiff repeats and realleges Paragraphs 1 through 59 of the Complaint as if set forth fully herein.

94. In executing the promissory note and employment agreements, *supra*, the parties established contractual relationships through mutual obligations and consideration.

95. Under the Note, the parties agreed to a repayment plan of 112 equal monthly installments of principal and interest in the amount of $4,649.65 through authorized payroll deductions.

96. In 2016-2017 the federal minimum wage law changed, and Wells Fargo changed the financial advisor's debt structure.

97. As a result, Wells Fargo financial advisors' notes were extended without the financial advisors' consent or knowledge.

98. This extension damaged Mr. Wilkins as the extension increased Mr. Wilkins' loan balance by at least $112,000.00, which increases daily due to interest.

**WHEREFORE**, Plaintiff Avery Wilkins is entitled to all contract damages, including expectation and reliance damages, interest, his reasonable attorneys' fees, and costs against Wells Fargo and such other relief this Court deems just and proper.

### COUNT V– ANTICIPATORY BREACH OF CONTRACT

99. Plaintiff repeats and re-alleges Paragraphs 1 through 46 of the Complaint as if set forth fully herein.

100. A contract to enter promissory note agreements between the parties exists in this case, *supra*.

101. When Wells Fargo indicated Mr. Wilkins would be required to pay approximately $470,000.00 upon leaving the company before 10 years, it signaled an intention to breach said contract.

102. Although damages have yet to occur, it is anticipated they will occur based on the statements and conduct of Wells Fargo that Mr. Wilkins

would be required to pay approximately $470,000, if he left Wells Fargo advisors before 10 years, not the 6 years he was promised.

103. Wells Fargo manifested by its words a positive intention not to perform under the terms of said contract.

104. Plaintiff was fraudulently induced to enter said contract, *supra*.

**WHEREFORE**, Plaintiff Avery Wilkins is entitled to all contract damages, including expectation and reliance damages, interest, his reasonable attorneys' fees, and costs against Wells Fargo and such other relief this Court deems just and proper.

## COUNT VI – BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

105. Plaintiff repeats and re-alleges Paragraphs 1 through 46 of the Complaint as if set forth fully herein.

106. A covenant of good faith and fair dealing is implied in every contract.

107. An express term of the promissory note agreement was the promise that Mr. Wilkins could retire after six (6) years without additional obligation or penalty, an express provision agreed to by the parties.

108. Wells Fargo exercised a judgment conferred by these express terms of the agreement in such a manner as to evade the spirit of said transaction.

109. By Wells Fargo's declaration that Mr. Wilkins could not retire after 6 years without paying Wells Fargo Advisors approximately $479,000.00, Mr. Wilkins was denied an expected benefit of the contract.

**WHEREFORE**, Plaintiff Avery Wilkins is entitled to all contract damages, including expectation and reliance damages, interest, his reasonable attorneys' fees, and costs against Wells Fargo and such other relief this Court deems just and proper.

## COUNT VII – REFORMATION OF THE PROMISSORY NOTE CONTRACT

110. Plaintiff repeats and re-alleges Paragraphs 1 through 46 of the Complaint as if set forth fully herein.

111. A mistake occurred that caused the promissory note contract to differ from what the parties intended in their agreement and accompanying amortization schedule, *supra*.

112. Wells Fargo's Regional Manager at the time, Thomas Stulshatz, along with Mr. Wilkins, believed that the overall terms of the promissory note agreement provided that Mr. Wilkins could retire after 6 years by Mr. Wilkins turning his accounts over to his business partner without further obligation or penalty.

113. Due to mutual mistake, the writing of the promissory note agreement failed to accurately set forth the terms of the actual agreement.

114. By doing so, the written promissory note agreement did not incorporate the true intentions of the parties, *supra*.

**WHEREFORE**, Plaintiff Avery Wilkins is entitled to reformation of the promissory note agreement to reflect the true intention of the parties to let Plaintiff retire after 6 years without further obligation or penalty to Defendant, his reasonable attorneys' fees, and costs against Wells Fargo and such other relief this Court deems just and proper.

### COUNT VIII – BREACH OF FIDUCIARY DUTY

115. Plaintiff repeats and re-alleges Paragraphs 1 through 59 of the Complaint as if set forth fully herein.

116. As Mr. Wilkins' employer and manager of Mr. Wilkins' book of business, Wells Fargo owed a duty of loyalty to Mr. Wilkins.

117. Mr. Wilkins placed trust and confidence in Wells Fargo to manage his book of business.

118. Wells Fargo undertook such trust and assumed a duty to advise, counsel, and/or manage Mr. Wilkins and his book of business.

119. Wells Fargo breached their duty to Mr. Wilkins through the following acts:

   a. On or about January of 2019, Wells Fargo Manager, in training, Eric Holder ("Mr. Holder") was to assist Mr. Cox and Mr. Wilkins with splitting their book of business evenly.

    b. Mr. Holder told Mr. Cox and Mr. Wilkins that he had never assisted in splitting financial advisors' books so Mr. Gene Crookshanks would assist. Mr. Crookshanks was an assistant manager who was trained on matching financial advisors with clients.

    c. However, during the meeting to split the Mr. Wilkins and Mr. Cox's book of business, Mr. Crookshanks did not assist at all.

    d. Instead, Mr. Cox was permitted to show Mr. Wilkins that all the investment accounts were already divided in the way Mr. Cox desired.

    e. Again, the change in financial advisors cannot be done by a financial advisor. Someone at Wells Fargo management had to change the assignments for each account.

    f. Mr. Wilkins did not have a choice nor was he able to negotiate.

    g. The accounts that were provided to Mr. Wilkins were inappropriately split unevenly and the uneven split significantly lowered Mr. Wilkins' month revenue.

120. Mr. Wilkins suffered and continues to suffer damages as a result of this breach.

**WHEREFORE**, Plaintiff Avery Wilkins is entitled to all damages, interest, his reasonable attorneys' fees, and costs against Wells Fargo and such other relief this Court deems just and proper.

## JURY DEMAND

121.  Plaintiff demands trial by jury in this case on all issues so triable.

**LAW OFFICE OF ROBERT ECKARD & ASSOCIATES, P.A.**

_____
**ROBERT D ECKARD, B.C.S.**
**FBN: 0162655**
**RAPHAEL CUA, ESQ.**
**FBN: 110584**
**3110 Palm Harbor Blvd**
**Palm Harbor, FL 34683**
**(727) 772-1941 Telephone**
**(727) 771-7940 Facsimile**
Robert@RobertEckardLaw.com
Raphael@RobertEckardLaw.com
*Attorney for Plaintiff*